## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

PHILIPS NORTH AMERICA LLC,

       Plaintiff,

v.                                           Civil Action No. 2:21-cv-00298

PROBO MEDICAL LLC,

       Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

This matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and is referred to the undersigned United States Magistrate Judge for "all discovery disputes" pursuant to 28 U.S.C. § 636 and the Court's January 4, 2016 Standing Order, which was entered in this case on May 16, 2021. (ECF No. 10.) Pending *sub judice* are the *Motion to Compel Compliance with Discovery Order and for Sanctions* (ECF No. 146) and renewed *Motion for Sanctions* (ECF No. 225), both filed by Plaintiff Philips North America LLC ("Plaintiff" or "Philips"). Therein, Plaintiff requests that the Court enter a default judgment against Probo Medical, LLC ("Probo" or "Defendant") as a sanction for the consistent pattern of egregious discovery misconduct in this civil action by Probo itself, and by its *pro hac vice* counsel, Adam Arceneaux and Eric J. McKeown. As detailed *infra*, the undersigned respectfully **RECOMMENDS** that Plaintiff's *Motions* be **GRANTED**, that the Court enter a default judgment against Probo on all counts, and that this matter proceed to trial solely on the issue of damages.

I.    **FINDINGS OF FACT**

Because Probo's conduct during the entire course of this litigation is relevant to the issue of an appropriate sanction, a more detailed discussion of the context and procedural history of this matter is necessary. Plaintiff Philips North America LLC ("Plaintiff" or "Philips") is a corporate entity engaged in the manufacture, sale, and servicing of medical-imaging systems, including ultrasound machines, and the attendant proprietary software installed within these systems. According to Plaintiff, many of the options, functions, and add-on features (collectively, the "extra options") for these machines are not standard and must be licensed to each end-user directly from Philips for a fee; further, only those specifically authorized by Philips are permitted to access its proprietary software and to enable the extra options on a Philips-brand medical-imaging system. (ECF No. 19 at 1.)

On May 13, 2021, Plaintiff initiated the instant civil against Radon Medical Imaging Corporation-WV and Radon Medical, LLC (together, "Radon"),[1] entities engaged in the sale and servicing of medical imaging devices, including Philips-brand systems, for hospitals and other healthcare providers. (ECF No. 1 at ¶¶ 7-10.) The *Complaint* alleged that Plaintiff suffered harm as a result of an intentional scheme by Radon to systematically "hack," or tamper with, proprietary software access controls to empower Radon's alleged modification, purchase, and sale of adulterated Philips-brand systems (the "hacking scheme"). *See id.* Radon's alleged hacking scheme involved a "pattern and practice" of enabling extra options in Philips-brand systems—without compensating

---

[1] Plaintiff did not name Probo in its initial *Complaint*. (*See* ECF No. 1.)

Plaintiff or obtaining its authorization or license to do so—in order to sell imaging systems at a discount and thereby compete directly with Philips for commercial gain. *Id.* Plaintiff also alleged specifically that Radon altered proprietary software on two Philips-brand ultrasound machines that Radon sold to King's Daughters Medical Center ("KDMC") in Ashland, Kentucky (the "KDMC machines"), which were allegedly accessed and altered to enable more than $300,000 worth of extra options without authorization or license from Plaintiff.

Based upon these allegations, Plaintiff asserted seven causes of action against Radon: violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("Count I"); violation of the West Virginia Computer Crime and Abuse Act, W. Va. Code § 61-3C-1 *et seq.* ("Count II"); violation of the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201 and 1202 ("Count III"); violation of the Defendant Trade Secrets Act, 18 U.S.C. § 1836 ("Count IV"); violation of the West Virginia Uniform Trade Secrets Act, W. Va. Code § 47-22-9, *et seq.* ("Count V"); Unfair Competition ("Count VI"); and Fraud ("Count VII"). Additionally, Philips sought a permanent injunction preventing Radon from further accessing Plaintiff's systems and from further disclosing and/or using its confidential and trade-secret information. *Id.*

Following service of process, Radon filed a *Motion to Dismiss* the *Complaint* on August 11, 2021, arguing that the action should be dismissed pursuant to Rule 19 of the Federal Rules of Civil Procedure because Philips failed to join two "necessary and indispensable parties"—upstream suppliers Probo and Ultrasound Online, LLC ("Ultrasound Online").[2] (ECF No. 19 at 3.) Radon asserted that these two entities

---

[2] By stipulation of the parties, Defendants Radon and Ultrasound Online were dismissed pursuant to Rule 41(a)(1)(ii) of the Federal Rules of Civil Procedure on September 21, 2022, and November 22, 2022, respectively. (ECF Nos. 104; 123.)

provided the two KDMC machines to Radon "with all of the software installed, configured and enabled, and Radon "made no additional adjustments to any software." (ECF No. 14 at 3.) Consequently, Radon alleged, Probo and Ultrasound Online were responsible for any unauthorized software alterations on the KDMC machines. *See id.* The presiding District Judge dismissed Plaintiff's fraud claim, but otherwise denied Radon's *Motion to Dismiss* (ECF No. 13), and the action proceeded to the discovery phase on August 27, 2021. (ECF No. 19 at 9; *see also* ECF No. 23.)

Philips filed the operative *Amended Complaint* thereafter on October 8, 2021. (ECF No. 28.) With the exception of the fraud claim previously dismissed by Judge Goodwin, the *Amended Complaint* made substantially the same claims, and simply named Probo and Ultrasound Online as additional Defendants alleged to have engaged in the purported option-hacking scheme. Based upon information from Radon, Plaintiff's *Amended Complaint* alleged that the two KDMC machines were sourced by Probo and Ultrasound Online. (See ECF Nos. 28 ¶ 51; 90 at 3.) Additionally, the *Amended Complaint* set forth new allegations concerning Probo's alleged role in the sale of the two Philips-brand ultrasound machines to KDMC. Specifically, Plaintiff alleged that Radon purchased the two KDMC machines from Probo; that Probo represented that it could provide Philips' systems with the specific software options requested by KDMC; that Probo obtained the Philips' systems from defendant Ultrasound Online; and that Probo had acquired KPI Healthcare Inc. ("KPI"), as well as MedCorp LLC and TriSonics, Inc.—entities allegedly known by Probo to "use hacking tools and other methods to unlawfully gain access to Philips' proprietary tools and to enable unlicensed options on Philips systems"; that Ultrasound Online employed a General Manager who recently worked for one of those companies (KPI); and that Ultrasound Online authorized Probo "to distribute our new

4

PHILIPS Ultrasound Equipment to installation sites within North America" and indicated that "Probo agrees to provide all proper service maintenance and support." (*See* ECF Nos. 28; 90 at 3-4.) Additionally, Plaintiff's *Amended Complaint* further alleged as follows regarding Defendant Probo:

> Upon information and belief, Probo is engaged in a pattern and practice of purchasing and selling systems that it knows and/or reasonably should know have been modified without authorization from Philips. Over the past several years, Probo has acquired and/or purchased the assets from companies engaged in similar services and business activities, which Probo knows use hacking tools and other methods to unlawfully gain access to Philips' proprietary tools and to enable unlicensed options on Philips systems. Those companies include, without limitation, KPI Healthcare Inc., MedCorp LLC and TriSonics, Inc. Upon information and belief, Probo directs, authorizes and/or otherwise approves the unlawful methods used by its subsidiaries on the Philips systems it acquires in these transactions."

> On information and belief, Probo modifies and/or purchases and sells the modified systems for a significant profit with full awareness of this unlawful conduct. Indeed, on information and belief, Probo knowingly sold adulterated Philips ultrasound systems, which contained unlicensed Philips software that it acquired from KPI [Healthcare Inc. ("KPI")]. Accordingly, and to the extent Probo claims it did not modify the King's Daughters systems, it sold those systems to Radon aware that options identified in its quotation were unlicensed and enabled without authorization from Philips. Consistent with its pattern and practice of purchasing and selling modified systems, Probo presumably profited from the sale of the King's Daughters systems, which contained valuable unlicensed options. On information and belief, Defendants used one or more unauthorized access methods, which may include counterfeit, intentionally modified, or otherwise unauthorized Philips access control certificates, key generators, computer scripts, or some other unauthorized access methods to illegally enable software options before selling the devices to King's Daughters Medical Center."

(*See* ECF No. 90 at 3-4 (citing ECF No. 28 at ¶¶ 52-53).) Finally, Plaintiff alleged that Defendants' alleged scheme caused "substantial harm" by imperiling Plaintiff's proprietary software and trade secret information, and by impeding Plaintiff's ability to control the licensing of its software, the features and functionality of its medical imaging devices, and its ability to access its own proprietary data. (ECF No. 28 at 19.)

Attorneys Adam Arceneaux ("Arceneaux") and Eric J. McKeown ("McKeown"), of Ice Miller LLP (together, "defense counsel"), entered an appearance on behalf of Probo on December 6, 2021 (*see* ECF Nos. 44; 45),[3] and Probo filed its *Answer* to Plaintiff's *Amended Complaint* shortly thereafter on December 13, 2021 (ECF No. 46). Probo's *Answer* conceded that Probo sold the KDMC machines to Radon, who in turn sold them to KDMC; however, Probo denied the substance of the remaining allegations. *See id.*

On January 27, 2022, Philips served Probo with its *First Set of Interrogatories* and *First Set of Requests for Production of Documents and Things* (together, the "*First Requests*"), seeking information regarding the KDMC machines specifically and the broader pattern-and-practice allegations concerning Probo's alleged hacking scheme.[4] (ECF Nos. 59 through 63; 85-3; 85-4; 90 at 4.) Subsequently[5] on February 28, 2022, Plaintiff served Probo with its *Second Set of Discovery Requests* (the "*Second Requests*),

---

[3] On December 6, 2021, Arceneaux and McKeown appeared *pro hac vice* and designated attorneys Niall A. Paul and Clifford F. Kinney, Jr., of Spilman Thomas & Battle, PLLC, as local counsel pursuant to Rule 83.6 of the Court's Local Rules of Civil Procedure. (ECF Nos. 44; 45.) Both Arceneaux and McKeown withdrew as counsel for Probo on October 4, 2023, following entry of appearance of Probo's current counsel on September 21, 2023. (*See* ECF Nos. 216 through 224; 241 through 242.)

[4] This included requests for documents and communications regarding Probo's sale, purchase, or acquisition of any Philips Systems—with a specific list of machines identified by serial number and a list of specific options, as well as a request for documents regarding acquisition or use of Philips's service materials for servicing Philips-brand systems and enabling the extra options; Probo's communications with any of the named Defendants or KDMC; and documents regarding Probo's organizational structure and financial performance related to Philips. (*See* ECF Nos. 85-3; 85-4; 86; 90 at 4 nn.1-5.) Philips asserted that the discovery it requested Probo to produce—regarding the enablement of options on Philips systems and Probo's methods of accessing information on these systems"—went to "the heart" of its allegations against Probo. (ECF No. 92 at 8-9.).

[5] The undersigned further notes that the Court entered the parties' *Agreed Protective Order* setting forth the terms for the handling of confidential documents during the discovery phase of this action on January 31, 2022, and that on February 4, 2022, the parties filed a *Joint Motion to Amend the Scheduling Order*—the first of many. (ECF No. 66.) On February 7, 2022, the Court entered its first *Amended Scheduling Order*, granting the parties' *Joint Motion* and extending the deadline for written discovery requests to May 23, 2022; the deadline for Plaintiff to serve expert reports to June 6, 2022; and the close of discovery to July 1, 2022. (ECF No. 67.)

which set forth five document requests, all relating to Probo's involvement with a specific corporate-acquisition deal and attendant assets. (ECF Nos. 71; 85-5; 86 at 6.)

On March 1, 2022 and then on March 30, 2022, Probo served its responses to Plaintiff's *First Requests* and *Second Requests* respectively (together, the "discovery requests"). (ECF Nos. 74; 75; 83; 85-11.) Probo concedes, however, that its responses did not substantively answer or produce documents in response to the "vast majority" of Plaintiff's discovery requests—on the grounds that the requests were objectionable. (*See* ECF Nos. 85-5; 85-6; 85-7; 86 at 6.) In support of its position, Probo expressed its own opinion that the scope of discovery should be limited solely to the two KDMC ultrasound machines; since Plaintiff's discovery requests extended beyond these machines, Probo characterized them as burdensome and irrelevant. (ECF Nos. 86 at 6; 92 at 8.) Probo did make a limited document production, comprised of some 600 pages. (ECF No. 92 at 8.) According to Plaintiff, however, "most" of these documents were electronic duplicates of one another. (ECF No. 92 at 8-9, 9 n.9.) Further, Plaintiff argued that Probo's responses were "insufficient" even under Probo's self-imposed limitation on the scope of discovery, because Probo "refused to produce documents falling within these categories that relate to the KDMC systems, or even certify that it had none." *Id.*

On April 21, 2022, the parties filed their second *Joint Motion to Amend the Scheduling Order*. (ECF No. 87.) In support of their *Joint Motion*, the parties stated that an approximate three-month extension of the case schedule was needed to allow Plaintiff to address Probo's objections to its discovery requests, in which Probo "objected to producing discovery related to other Philips machines." (ECF No. 87 at 1-2, 4.) The parties further stated in their *Joint Motion* that an extension was necessary because the parties were waiting for the Court to rule on their discovery dispute, as a ruling in Plaintiff's favor

would require Probo to supplement its written discovery responses and its production of documents and electronic evidence. Importantly, the parties expressly acknowledged that Plaintiff's motivation was to ensure that its counsel and experts had sufficient time to review and analyze Probo's supplementation before Plaintiff's deadline to serve expert reports on June 6, 2022. (*See* ECF Nos. 67; 87 at 5-6.) The parties expressly acknowledged that Probo's supplementation and Philips's subsequent review by its counsel and experts, would be time-consuming and involve "significant technical issues, including the enablement of unlicensed options" on Philips-brand systems. (ECF No. 87 at 5 n.3.) The parties further stated in their *Joint Motion* that, without the three-month extension, Probo would be required to supplement its written discovery responses, its production of documents, and electronic evidence, all with sufficient time for Plaintiff's counsel and experts to review and analyze Probo's supplementation before Plaintiff's deadline to serve expert reports on June 6, 2022.[6] (*See* ECF Nos. 67; 87 at 5-6.)

On April 21, 2022, the Court granted the parties' *Motion* and entered a second *Amended Scheduling Order*, which extended the deadline for written discovery requests from May 23, 2022, to August 16, 2022; the deadline for Plaintiff to serve expert reports from June 6, 2022, to August 2, 2022; and the close of discovery from July 1, 2022, to September 27, 2022.[7] (ECF No. 88.)

---

[6] Additionally, during the spring of 2022 Plaintiff expressly stated on the record several times that "Probo's discovery responses are needed in a timely fashion to permit Philips to consider them prior to any expert disclosure." (ECF No. 100 at 9; *see also* ECF Nos. 87; 88.)

[7] During this same time period, Plaintiff and Probo formally stipulated to extending Plaintiff's deadline to move to compel Probo's substantive discovery responses "until and including the close of discovery." (ECF Nos. 81 at 2; 82; 84; 89.) The parties' reported that they agreed to the extension in furtherance of their efforts "to resolve any discovery deficiencies" and "issues" in dispute, without Court intervention. *See id.*

On April 19, 2022, Probo filed a *Motion for Protective Order* (ECF No. 85), arguing that the scope of its responses to Plaintiff's discovery requests should be limited to the two KDMC ultrasound machines identified in the *Amended Complaint*, and should not extend to details of any corporate acquisition deals. (*See* ECF Nos. 86; 87 at 4.) On May 3, 2022, Philips filed its *Response* brief in opposition to Probo's *Motion for Protective Order*, as well as an affirmative *Motion to Compel* Probo's supplemental discovery responses.[8] (ECF Nos. 90; 91.) Philips argued in its *Motion to Compel* that Probo's relevance objection—to all medical-imaging machines beyond the two ultrasound machines sold to KDMC—lacked legal support for "its narrow and constrained view of what is discoverable." (ECF No. 90 at 2, 9.) Under the "broad standard" for the scope of discovery pursuant to Rule 26(b)(1) of the Federal Rules of Civil Procedure, Philips argued that it was "unquestionably" entitled to discovery concerning "precisely" the general subject matter of the litigation: "Probo's modification, purchase, and sale of adulterated Philips systems; its pattern and practice of acquiring companies that engage in unlawful access to and modification of Philips' systems; Probo's knowledge of these improper modifications; and the recent $450 million "investment" in Probo on the heels of these acquisitions." (ECF No. 90 at 9.)

Philips further argued that Probo's resistance to supplementation demonstrated its "intent to obstruct relevant discovery," and motivation to improperly deny Philips access to discoverable information. (ECF No. 90 at 2, 17.) In response to Probo's objection based upon the burden of production, for example, Philips argued that Probo's CEO testified elsewhere that "much of the information Philips seeks regarding the Philips

---

[8] Philips's *Motion to Compel* raised "substantially the same" scope and burden issues Probo raised in its *Motion for Protective Order*. (ECF No. 90 at 7 n.6

systems that Probo purchases and sells (and the options enabled on those systems) can be easily pulled" from a query of Probo's "Salesforce database." (ECF Nos. 90 at 3, 15-18; 90-1 at 7-9.) Philips requested that the Court deny Probo's *Motion for Protective Order*, and "immediately" compel Probo "to produce relevant documents and information regarding its transactions and practices involving Philips's systems beyond the two KDMC machines." (ECF No. 90 at 3.) Philips's *Motion to Compel* affirmatively sought an order compelling Probo to produce the information at issue in its *Motion for Protective Order*, characterized by Philips as "documents and information related to Probo's trafficking in adulterated Philips' systems, its modification of Philips systems and unauthorized access to Philips' proprietary servicing information, and its pattern and practice of acquiring known bad actors in the industry as part of its scheme to profit by selling Philips systems with unauthorized and unlicensed options enabled on those systems." (ECF No. 92 at 2.)

In response, Probo represented, through its attorneys Arceneaux and McKeown, that it had a "limited role" in the sale of the two KDMC machines, having never "received, touched, inspected, or handled" them "in any fashion." (ECF No. 86 at 9; *see also* ECF No. 85-6.) As Plaintiff asserted, Probo essentially offered "nothing but its counsel's say-so" in support of its "limited-role" argument. (ECF No. 90 at 15.) Moreover, contrary to these representations by Probo's counsel Arceneaux and McKeown, Plaintiff demonstrated that the six-hundred pages of documents Probo did produce contained evidence that Probo's involvement in the sale of the KDMC machines was, as Plaintiff characterized, "not so hands-off." (ECF No. 90 at 12 n.9.) These documents included email communications between Probo managers and executives, as well as representatives of Radon, regarding the two KDMC machines. (*See* ECF No. 90-3 at 5-6.)

Philips highlighted some of these emails wherein Probo managers, executives, and other representatives "advised on installation issues with the two machines ([ECF No. 90-3, at 12, Bates Number] PROBO0000373), inspected the systems to 'make sure nothing happened on the flight' before they were delivered to Radon ([Id. at 13, Bates Number] PROBO0000411), made 'adjustments to the Philips machines before they were delivered to Radon ([Id. at 12, Bates Number] PROBO0000410), advised as to servicing issues ([Id. at 15, Bates Number] PROBO0000422), and involved itself heavily . . . with the training related to the KDMC Systems." ([Id. at 2, 7, 11, Bates Numbers] PROBO0000094, PROBO0000106, PROBO0000382)."

Similarly, in its *Response* to Plaintiff's *Motion to Compel*, Probo reiterated its objection to the scope of discovery and argued that, because Plaintiff's discovery requests sought information beyond the two KDMC ultrasound machines, the requests were "not relevant to any party's claim or defense," "not proportional to the needs of the case," and "would be extremely burdensome and costly for Probo to answer in full." (ECF No. 98 at 4-5, 7.) In further support of its burdensomeness argument, Probo submitted the Affidavit of its Chief Executive Officer ("CEO"), Michael Asmer ("Asmer" or "Probo's CEO"). (ECF No. 98-1.) Therein, Asmer attested that responding to Plaintiff's discovery requests, *as written*, would require Probo to search its records and gather a large number of documents, emails, and other communications. (ECF No. 98-1 at 3.) Asmer estimated "the total volume of documents and/or communications" sought in Plaintiff's discovery requests, as written, "would be into the hundreds of thousands." *Id.*

In its *Reply* brief in support of its *Motion to Compel*, Plaintiff pointed out that Asmer's affidavit "is vague as to the number of Philips machines at issue and thus fails to meaningfully address the extent of any purported burden . . . . Indeed, Mr. Asmer's

affidavit does not even identify the extent of Probo's responsive ESI, and instead makes only a passing reference to the need to search emails." (ECF Nos. 98-1; 100 at 5 nn.2-3.) Plaintiff's counsel further argued that *Affidavit's* lack of specific details was "very telling," because Asmer's estimation of the "hundreds of thousands" of documents and communications at issue "never mentioned what was available that would be responsive to our request that is actually in the sales force database." (ECF No. 121 at 30.) Finally, Plaintiff argued that, if Probo truly did not have information about any "modifications to Philips' machines," as Asmer represented in his *Affidavit*, then "Probo should amend its responses to state that it has no responsive documents regarding such modifications." (ECF No. 100 at 11.) Plaintiff concluded that "Probo's refusal to do so strongly suggests that it is impermissibly withholding responsive information." *Id.*

On December 19, 2022, the undersigned entered an *Order* (the "2022 *Order*") granting Probo's *Motion for Protective Order* in part, and limiting the scope of discovery to a specific list of topics with respect to ultrasound machines only, for the time period between May 13, 2017, through May 13, 2021. (ECF No. 130; *see also* ECF No. 126-1.) In turn, Plaintiff's *Motion to Compel* was granted, and Probo was ordered to produce responsive documents and information falling within this modified scope within 30 days – by January 18, 2023.

Probo took no substantial action to comply with the Court's 2022 *Order*. Nor did Probo file objections to the *Order* or otherwise seek relief prior to the Court's January 18, 2023 deadline. *See* 28 U.S.C. § 636(b)(1). Instead, Probo immediately pressed Philips to agree to additional time for the defense to comply. To effect Plaintiff's agreement, Probo misrepresented the true status of its progress, telling Plaintiff that it would need an extension of just "90 days" to complete its production and comply with the Court's

December 2022 *Order*. However, Probo did not have a good-faith factual basis for making this representation. Probo would still need to gather relevant information from its records, which included gathering electronic data as well as digitizing boxes of physical documents. Until this process was completed, Probo could not estimate the status of its production with any reasonable accuracy. Moreover, once Probo finished gathering its records, its counsel would still need to conduct a routine review of the documents before producing them to Plaintiff. To be clear, the undersigned's recommendation of sanctions is not based upon a pedantic requirement that all parties before the Court must confine their representations with scientific exactitude; nor was Probo's misrepresentation of the production status an isolated instance of an honest miscalculation. Simply put, the extent of the miscalculation is far too vast; subsequent proceedings revealed that, as of the Court's January 18, 2023 deadline for Probo to complete its production, over 92% of Probo's ultimate production in this case remained virtually untouched. Probo did not miscalculate—it completely abdicated its duty to participate in discovery in good faith, and concealed this information from Plaintiff, and from the Court. Probo employed a strategy of delay at every turn, bolstered by its repeated misrepresentations regarding the status of its discovery compliance.

Based upon defense counsel's representation that Probo expected to complete its review and production in approximately 90 days—by the end of April 2023—Plaintiff agreed not to enforce the January 18 deadline, to allow Probo to make a "rolling" production pursuant to its 90-day timeframe, and to seek a joint extension of the case schedule. Pursuant to these agreements, the parties filed a *Joint Motion to Modify Schedule* on February 1, 2023, requesting that Judge Goodwin "modify" the existing case schedule, "extending the majority of its deadlines by approximately five months." (ECF

No. 132 at 1.) The *Joint Motion* subtly framed the undersigned's December 2022 *Order* in a manner that diluted, downplayed, and obscured Probo's noncompliance. For instance, the parties characterized the *Order* as having "required Probo to supplement its written discovery responses and document production . . . beyond the two KDMC machines." (ECF No. 132 at 7-8.) Probo then expressly represented that it "will supplement its discovery responses and document production *in accordance with Magistrate Judge Tinsley's Order*." *Id.* at 9 (emphasis added). Noticeably absent from this discussion was any reference to Probo's January 18, 2023 deadline to complete its supplementation, or its total failure to even attempt to comply with that deadline.

Compounding the list of Probo's misrepresentations to Plaintiff and to the Court, the *Joint Motion* further stated that there was good cause for an extension, because "the parties have been diligent in their efforts to move this case forward [and] . . . to move discovery along following Magistrate Judge Tinsley's December 19, 2022 Order." (ECF No. 132 at 8-10.) In support of this statement, the *Joint Motion* stated that "the parties discussed discovery responses and protocol for production of electronically stored information [("ESI")], and have since communicated regarding Defendant's progress in complying with Magistrate Judge Tinsley's [December 2022] Order." *Id.* at 8. While the parties certainly *discussed* an ESI protocol—a fundamental tool in ESI-heavy litigation—and *discussed* the production status, Probo has failed to demonstrate that it made *any* effort—let alone diligent effort—to move discovery along during the seven-month time period between December 2022 and July 2023.

Repeating Probo's baseless estimate, the *Joint Motion* also stated as follows:

*Probo has advised Philips that*, in light of the scope of the Court's Order and the need to search, collect and produce electronically stored information, and the anticipated volume of its production, *it would need approximately*

14

> *90 days to complete a rolling production*, after which the parties will engage in deposition discovery.

*Id.* at 8-9.

Based upon the representations in the parties' *Joint Motion*, the Court granted their request for an extension of the case schedule on February 2, 2023. (ECF No. 136.) The *Fourth Amended Scheduling Order*[9] extended the expert-disclosure deadline for the party bearing the burden of proof from February 27, 2023, to July 27, 2023; the deadline to serve written discovery requests from March 13, 2023, to August 13, 2023; and the deadline to file dispositive motions from May 17, 2023, to October 11, 2023.

Probo's communications leading up to the July 27, 2023 expert due date show that Probo continued in its sandbagging efforts, while continuing to mislead Philips into believing the production was on schedule. (*See* ECF 147 at 2096-2098.) Philips ultimately indicated that due to Probo's failure to comply, the present schedule was "unworkable", that the parties would need to seek extension of the schedule, and in so doing, Philips needed a "date certain" for Probo's compliance with the Discovery Order.  While Philips reasonably believed based on Probo's representations that compliance was around the corner, Probo shockingly responded that "in light of the vast volume of documents involved", it anticipated a completion date not until *August 31, 2023* – over a *month after* expert reports came due.  *Id.* at 2098. And the *extent* of Probo's delinquency was laid bare only after Judge Goodwin denied the parties' joint motion to extend the case schedule on July 6, 2023. (*See* ECF No. 143.) Probo then filed a Motion for Status Conference, in which Probo revealed that "[w]hile the total volume of additional

---

[9] Beginning on February 2, 2023, the Court's *Fourth Amended Scheduling Order* became the operative case schedule for the remainder of the relevant time period herein.

potentially responsive documents is not yet known with specificity . . . Probo estimates that it will be *in excess of 100,000 documents*". (ECF No. 144.) After the Court denied Probo's request for a status conference (in which Probo acknowledged its fault and the prejudice to Philips due to its failure to timely comply with the Discovery Order) (ECF No. 145), Philips was forced to file its Motion to Compel.

On July 21, 2023, this Court entered an *Order* (the "July 2023 *Order*") granting Plaintiff's *Motion to Compel* in part. (ECF No. 153.) At the outset, the Court noted that in light of Plaintiff's allegations in its *Amended Complaint* that "Probo, in concert with its subsidiaries and/or other corporate entities, is engaged in an unlawful pattern and practice of acquiring stolen information and other corporate assets in order to gain access to premium features on Philips ultrasound machines without paying Philips for a license to do so and without Philips's knowledge and consent . . . Probo's discovery conduct *over the last sixteen months is particularly concerning to the Court.*" *Id.*

Additionally, following a lengthy hearing, the Court made further detailed findings regarding Probo's "egregious" discovery-related conduct:

- That following the Court's entry of its December 19, 2022 Order granting in part Philips' motion to compel, "Probo did not comply with the Order", and though the parties agreed on a "lengthier response deadline", "Philips agreed to multiple extensions of time thereafter, *relying upon Probo's inaccurate representations that its document-review process was nearly complete*";

- That even though Probo had represented to Philips that it would complete its production in compliance with the Court's Discovery Order by the end of April 2023, as of July 20, 2023, "Probo indicated that its document-review process could not be completed until August 21, 2023 – *after* Philips's expert-disclosure deadline under the operative Fourth Amended Scheduling Order";

- That at the July 20 hearing, "Probo's counsel was unable to provide specific answers" to the Court's "questions regarding the amount of documents awaiting review" (and pointed out that while Probo suggested in its opposition

16

to Philips' motion that it had 20,000 additional documents to review, at oral argument, Probo's counsel represented that *not including its substantial group of purchase order and invoice documents,* Probo *still* had "over 100,000 documents" to review for production).

- That even then, "Probo's counsel was not even able to confirm the completion of data collection from his own client", and that it appeared that "Probo did not even start to digitize" a significant portion of its production (i.e., purchase orders) "until recently";

- And perhaps most alarmingly, and demonstrating Probo's utter failure to comply with the Discovery Order – and indeed, its deliberate attempt to obfuscate the status of its production – that "Probo did not put real efforts and resources toward its production *until July 6, 2023* – despite having represented to Philips in February of this year that its production would be complete in 'approximately 90 days'";

- That "[q]uite frankly, parties before this Court *routinely* complete far larger document reviews in much less time than the nearly seventeen months – more than five hundred days – that have passed since Philips served Probo with its Second Set of discovery requests on February 28, 2022;

- That the size of Probo's "universe" of documents in any event is irrelevant "if – *as the record evidence seems to indicate* – Probo did not actually take steps to review the documents in earnest until July 2023" – *i.e.,* months *after* it represented to the Court its production would be complete (the end of April); and

- That Probo made "inaccurate representations" to Philips "regarding the status and extent of its 'rolling' production – ***if not knowingly, then, at a minimum, in reckless disregard of the truth***".

Accordingly, the Court found that "Probo has egregiously failed to meet its discovery obligations ... in direct contravention of a Court Order" and that "once again", Philips is entitled to an order "compelling Probo to comply with its discovery obligations." *Id.* After ordering Probo to complete its production in compliance with the Court's Discovery Order by August 21, 2023, the Court stated as follows with respect to Philips' request for sanctions:

> [I]n light of the egregiousness of Probo's litigation conduct, the undersigned agrees that *sanctions are appropriate*. As Probo's compliance is still incomplete, however, the issue of what sanctions are appropriate will be held in abeyance until Probo has complied with its discovery obligations, at which time Philips may renew its request for sanctions by motion.

*Id*. The Court further concluded that "Probo is hereby **NOTIFIED** that failure to comply with this Order **WILL** result in the undersigned's recommendation to the presiding District Judge that default judgment be entered against Probo and trial proceed on the issue of damages only." *Id.*

In accordance with the Court's Order, Plaintiff renewed its Motion for Sanctions on September 26, 2023, seeking default judgment against Probo as a sanction for its "egregious" discovery misconduct based upon the Court's prior findings in its July 21, 2023 *Order*. Probo filed a timely *Response* brief to Plaintiff's renewed *Motion for Sanctions* on October 10, 2023 (ECF No. 247), and Plaintiff filed its *Reply* brief on October 17, 2023 (ECF No. 253). Subsequently on January 4, 2023, the parties appeared before the undersigned following Probo's request for a hearing on Plaintiff's *Motion*. At the conclusion of the hearing, the undersigned took the matter under advisement. Having considered the parties' briefing and other submissions on Plaintiff's *Motion*, as well as counsel's oral argument before the undersigned, this matter is ripe for review.

## II.    <u>STANDARD OF REVIEW</u>

On June 23, 2023, the U.S. Court of Appeals for the Fourth Circuit recently clarified its standard for imposing the sanctions Plaintiff seeks in its renewed *Motion for Sanctions* based upon a party's discovery abuses. *See Mey v. Phillips*, 71 F.4th 203, 217 (4th Cir. 2023) (affirming district court's grant of default judgment due to a defendant's pattern of abusive discovery conduct).

18

As the Fourth Circuit reiterated in the *Mey* case, the federal district courts are accorded "wide latitude in controlling discovery" as well as "broad discretion . . . to supervise discovery." *Id.* This case-management authority extends to imposition of sanctions for discovery abuses—even severe sanctions, when appropriate. *Id.* (citing *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014)). Consequently, the Federal Rules of Civil Procedure expressly authorize federal district courts to impose sanctions—including "rendering a default judgment against the disobedient party"—based upon discovery misconduct and/or deliberately disregarding a district court's pretrial order. *Id.* at 218 (citing Fed. R. 37(b)(2)(A)(vi), (d)(1)(A), (d)(3)). The Fourth Circuit qualified that, of course, "[w]hen the sanction involved is judgment by default, the district court's range of discretion is more narrow" because of the competing priorities of "the district court's desire to enforce its discovery orders" on one hand, and on the other "the party's rights to a trial by jury and a fair day in court." *Mey*, 71 F.4th 203 at 217 (citing *Mutual Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989)).

To balance those competing interests, the Fourth Circuit clarified that district courts must consider four factors in determining whether to sanction a party with default judgment: "(1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions" (hereinafter collectively, the "*Wilson* factors").[10] *Mey*, 71 F.4th 203 at 217.

---

[10] The Fourth Circuit characterized its four-factor analysis as the "*Wilson* factors," after the 1978 opinion from which they were derived. *See Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 503-04 (4th Cir. 1977), *cert. denied*, 434 U.S. 1020 (1978); *Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989).

The purpose of a *Wilson* evaluation is to "insure that only the most flagrant case, where the party's noncompliance represents bad faith and callous disregard for the authority of the district court and the Rules, will result in the extreme sanction of dismissal or judgment by default." *Richards*, 872 F.2d at 92 (citing Nat'l Hockey League, 427 U.S. at 643; *Wilson*, 561 F.2d at 504). Though harsh, such sanctions are warranted under such circumstances because "not only does the noncomplying party jeopardize his or her adversary's case by such indifference, but to ignore such bold challenges to the district court's power would encourage other litigants to flirt with similar misconduct." *Richards*, 872 F.2d at 92.

In reviewing a district court's imposition of such sanctions in *Mey*, the Fourth Circuit quoted the U.S. Supreme Court's express instruction to federal courts of appeals "to beware of the natural tendency on the part of reviewing courts to be heavily influenced by the severity of a district court's sanction for failure to comply with a discovery order." *Mey*, 71 F.4th 203 at 217 (citing *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 642 (1976); *Ardrey v. United Parcel Serv.*, 798 F.2d 679, 682 (4th Cir. 1986)). In this context, the Fourth Circuit explained that "[w]e have also upheld a district court's imposition of litigation-ending sanctions where counsel acted in full awareness of and utter disregard for the district court's discovery timetable." *Mey*, 71 F.4th 203 at 217 (citing *Rabb v. Amatex Corp.*, 769 F.2d 996, 1000 (4th Cir. 1987) (unpublished) (affirming district court's preclusion of the plaintiff's evidence and entry of summary judgment based upon party's unjustifiable disregard for the pre-trial discovery deadline).

The facts and procedural backdrop of the *Mey* decision are strikingly similar to the facts at hand. In that case, plaintiff Diana Mey alleged, *inter alia*, that the defendants were acting in concert to run an illegal telemarketing and consumer exploitation scheme in

violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.* *Mey*, 71 F.4th at 208. Based on Mey's theory that "other corporate entities" were involved in the scheme, she served the defendants with a set of written discovery on September 26, 2019. *Id.* Alleging that the defendants' scheme was effected through a "vast and complex web of corporate entities," Mey's requests focused on their potential relationships "with any other corporate entities that should be named defendants." *Id.*

After defendants' extensive delay and failure to respond "fulsomely and accurately," the federal district court granted Mey's motion to compel complete responses to her discovery requests. *Id.* at 209. The court did not issue sanctions at that time, but permitted Mey to "re-raise" the issue in the future if appropriate. *Id.* However, the defendants "continued to commit the same abuses of discovery for which the court had previously admonished" them, including refusing to produce financial records, failure to disclose a related entity, and denying having any transaction-related documents (reflecting ownership interest, merger, dissolution, transfer of assets, etc.) for any entities. *Id.* at 211.

By the close of discovery, more than two years after Mey served her initial requests, and after filing three motions to compel, the defendants "collectively had produced only 57 documents, most of which were duplicates of filings publicly available." *Id.* at 212. Describing the defendants' "orchestrated delay," Mey argued that these tactics "impacted her expert disclosure and discovery deadlines," which had already been extended. *Id.* Further, Mey could not prepare her expert witness due to the defendants' withholding of bank records and misrepresentations regarding the status of several business entities and relationships, which the district court characterized as "further sandbagging the production of thousands of documents, emails, and corporate and financial records until

21

after the deadline for [Mey's] expert disclosures." *Id.* Continuing their pattern of deception and gamesmanship, the defendants then moved for summary judgment, asserting that Mey did not have sufficient evidence to prevail on her claims against them. *Id.* Most concerning of all, Mey independently discovered that the defendants had failed to produce 18 documents reflecting an interest in previously concealed entities. *Id.* at 214.

Ultimately, Mey renewed her request for sanctions based upon the defendants' "pattern of deception and disruption of the scheduling order." *Id.* at 212. Granting Mey's second and third motions to compel, the district court was troubled by "the evidence regarding the pattern and practice of [the defendants'] behavior," which included failing to "answer forthrightly," displaying a "pattern of concealing discoverable material," and "fail[ure] to obey [the court's] order." *Id.* at 213. The district court "employed its inherent power to impose sanctions" for the defendants' "bad-faith conduct" by striking their defenses. *Id.* at 214. Subsequently, "[w]ith the [defendants'] defenses stricken," the district court denied the defendants' motion for summary judgment as moot and noted that the "only issue remaining in this case [was] … a trial on [Mey's] damages." *Id.* Finally, Mey renewed her motion and sought "harsher sanctions, including default judgment" based on her allegations alleged that defendants continued to hide information that the district court had already designated as "essential" to her claims. *Id.* at 215.

The district court granted Mey's motion, directed the Clerk to enter default judgment against the defendants, and instructed that the case proceed to trial on damages alone. *Id.* at 216. In doing so, the district court found that all four *Wilson* factors were satisfied. *See id.* First, a finding of bad faith was "easily met." *Id.* Because Mey independently found organizations that the defendants failed to disclose, the district court found that it was "implausible" that the defendants' omission was due to mistake or

inadvertence." *Id.* Additionally, the district court was satisfied that "the amount of prejudice caused to [Mey] through [defendants'] noncompliance favors sanctions of default judgment," the "need for deterrence . . . favors default judgment" because defendants "had multiple, repeated opportunities to remedy their conduct and" did not do so, and "the judicial system will not tolerate repeated misconduct." *Id.* Finally, the district court found that the defendants' "conduct in this case, as well as the pattern of conduct in similar cases set forth in [the district court's] January 4 Order, demonstrates that the harsh sanction of default judgment is justified." In reaching its conclusion, the district court noted that in its "previous order, [it] found that defendants had failed to obey the discovery requirements set forth in the scheduling order and found that sanctions were appropriate." *Id.* The district court further noted that despite that order imposing sanctions, the magistrate judge's orders compelling responses to many of Mey's discovery requests, and the district court's finding that the defendants engaged in a pattern of concealing discoverable material, the defendants nonetheless persisted in their misrepresentations and violations of existing court orders in what the district court referred to as a "wider scope of intentional discovery abuse." *Id.* at 216.

The Fourth Circuit affirmed, concluding that the district court did not abuse its discretion by imposing sanctions for the defendants' "flagrant discovery violations" and "systemic discovery abuse . . . at the heart of this case." *Id.* at 222.

### III.    DISCUSSION

Here, this Court has already found that Probo failed to comply with the Court's Discovery Order, and that Plaintiff was unduly prejudiced as a result. Accordingly, the question presented is the appropriate sanction given Probo's non-compliance. For the reasons set forth below, the undersigned **FINDS** that all four of the *Wilson* factors

support the sanction of default judgment. Applying the four *Wilson factors*, the record is clear that the Defendant's pattern of misconduct in this civil action—its disruption, delay, subversion, and disregard for the time and resources of the Plaintiff, this Court, and the integrity of the judicial process—is *precisely* the type of "wide[] scope of intentional discovery abuse" that he Fourth Circuit found warranted sanctions of the utmost severity against the defendants in *Mey*. Consequently, the Fourth Circuit's *Mey* decision aptly demonstrates exactly why Plaintiff's requested sanctions in this civil action are warranted. Just as in *Mey*, here the utmost sanction is warranted in light of Probo's well-documented abuse and surreptitious undermining of "the integrity of the of the judicial process at a level that is utterly inconsistent with the orderly administration of justice and indeed, the very rule of law that forms the foundation for a functioning society. *See id.*

### a. Bad Faith and Prejudice

The first two *Wilson* factors—(1) whether the noncomplying party acted in bad faith and (2) the amount of prejudice his noncompliance caused his adversary—both support the sanction of default judgment against Probo. The record clearly documents bad-faith gamesmanship by Probo in the instant action, and consequent severe prejudice to Plaintiff. While a single instance of such conduct is insufficient, Probo has displayed a consistent pattern of gamesmanship and bad faith—delaying the progress of this matter toward resolution, resisting the production of discoverable information, making vague and carefully-worded representations to mislead the Court and Plaintiff, making representations to the Court without having a factual basis to support those representations, and—most significant—its utter disregard for and subversion of the Court's discovery orders and case schedules.

Clearly, Probo's utter and complete failure to prepare for an efficient and timely production in an ESI-heavy matter evinces its bad faith. Regardless of its stated lack of "in-house" counsel, Probo had adequate resources, legal representation, and business sophistication to enable its timely compliance with the Court's December 2022 *Order*. Yet as of July 21, 2023—six days before Plaintiff's deadline to disclose its experts—Probo had completed only 8% of its total production. Probo's representation to Plaintiff and to this Court that its review process was nearly complete easily demonstrates bad faith. Subsequently, *months* after the 90-day timeline Probo proposed, its progress continued to remain substantially incomplete. Probo still had not even completed *locating* all of its responsive documents. Pursuant to the undersigned's July 2023 *Order*, Probo—closely monitored by the Court and facing severe sanctions—finally completed its search for, and collection of, responsive information and the subsequent document-review process by defense counsel. Once that occurred, the true status and extent of Probo's "rolling" production was revealed: Probo turned over 92% of its entire production—121,365 documents—*after* Plaintiff's deadline to serve its expert disclosures, and only after the Court ruled in the undersigned's July 2023 *Order* that Probo's misconduct warranted severe sanctions.

The production of 121,365 documents and over *650,000 pages* of documents in a three-week period following the Sanctions Order clearly demonstrates that the Defendant sat on its hands did not even attempt to comply with Judge Goodwin's operative scheduling orders or the undersigned's December 2022 *Order* until July 2023—and only with substantial monitoring by the Court, *after* a finding that sanctions would be held in abeyance until Probo finally complied. These facts are directly contrary to the representations Probo made to Philips *and to this Court* regarding its purported "diligence."

Moreover, the record does not support Probo's attempt to paint its former counsel, Ice Miller, as the scapegoat for its misconduct. Probo failed to demonstrate legal authority or factual support for its advice-of-counsel argument under the circumstances at hand. To the contrary, Probo's consistent pattern of blatant gamesmanship continued after Arceneaux and McKeown's withdrawal as counsel for Probo in this matter. During oral argument before the undersigned on January 4, 2024, for instance, Probo represented that "there is ___***no prejudice***___" to Plaintiff—"it is a phantom." This statement is demonstrably inaccurate, as the undersigned expressly found in the Court's July 2023 *Order* that Probo's noncompliance resulted in egregious prejudice to Plaintiff. Further, Probo served extensive and oppressive discovery requests on the eve of the much-extended discovery deadline—and at the precise time that Plaintiff's counsel was trying to digest its eleventh-hour "document dump," a longstanding and well-known gamesmanship tactic. The sheer magnitude of documents at issue is troubling in light of Probo's failure to cooperate with Plaintiff to establish an ESI protocol in an ESI-heavy case. Regardless, Plaintiff clearly expressed on the record its need for sufficient time to analyze Probo's discovery responses *before* Plaintiff's expert-disclosure deadline— precisely the situation Plaintiff found itself in due to relying on Probo's misrepresentations.

Dismissing the effect of its consistent sandbagging, Probo argued that a finding of prejudice was unfounded. Like the defendants in *Mey*, Probo's argument is not supported by the record. *Mey*, 71 F.4th 203, 214 (4th Cir. 2023). In *Mey*, the Fourth Circuit rejected the defendants' arguments that the district court's sanction was too harsh, the discovery abuses were "inadvertent," and Mey was not prejudiced. *Id.* As the Fourth Circuit explained, the trial court properly found under similar circumstances that the defendants'

discovery abuses barred the plaintiff's access to information "essential" to her alter ego claims, and ultimately the merits of her claims, because "the discovery in question sought to establish whether defendant corporations are fraudulently conveying assets among themselves" and whether the Appellants "are behind this vast web of inextricably intertwined corporate entities and scheme[.]" *Id.*

Probo argued that Plaintiff enjoyed "*over six weeks before* the close of discovery," and thus had "ample opportunity and resources to develop its claims." (*See* ECF No. 142.) In support, Probo pointed out that Plaintiff was able to use a portion of Probo's production "in its [two total] depositions and expert reports." (ECF No. 247 at 2.) At the January 4, 2024 oral argument before the undersigned, Probo's counsel likewise shrugged off the intensely condensed timeline for Plaintiff's review of Probo's eleventh-hour document dump as just a run-of-the-mill reality of civil litigation. Probo's own evidence, however, belies the inaccuracy of this argument. As Probo itself acknowledged, pointing to the October 10, 2023 *Affidavit* of Shannon C. Kirk:

> Immediately upon the Court's July 21 Order, Probo engaged Ropes & Gray and assembled a team of more than 100 professionals (including attorneys at Ice Miller and Spilman Thomas & Battle, PLLC, contract document reviewers, and technology vendors) to work in excess of 8,000 combined hours between July 24 and August 21, 2023, to comply with the Court's July 21, 2023 Order.

(ECF No. 247-1 at 5 ¶ 16.) Under these circumstances, Probo's argument is demonstrably frivolous and only serves to underscore the brazenness of its improper tactics.

Plaintiff was forced to incur substantial resources to digest the production. Specifically, in addition to the associates already staffed on this matter, Philips' counsel needed to enlist 21 additional document reviewers (13 e-discovery attorneys and 8 temporary project attorneys), who completed their review and

coding of this massive document production on or about September 6, at a significant expense. During this process, Philips' core team of outside counsel spent over 100 hours supervising the additional document reviewers, reviewing Probo's rolling productions as well. Thus, Philips was extremely prejudiced in its ability not only to review, but *digest*, Probo's massive production for purposes of its supplemental expert reports and depositions. Instead of having a three-month period to accomplish these tasks—the basis for Plaintiff's agreement to a rolling production and a final extension of the case schedule—Plaintiff had less than two weeks, leaving no room for follow up discovery to address witnesses' testimony or deficiencies in Probo's Production; only four depositions have been taken in this case. The sheer volume of Probo's production speaks volumes about its abject failure to comply with Court's Discovery Order, to the unquestionably substantial prejudice to Philips.

Based upon Probo's egregious misconduct and the obvious severe prejudice to Plaintiff as a result, the undersigned **FINDS** that the first two *Wilson* factors support the imposition of the sanction of default judgment.

### b. Deterrence and Less Drastic Sanctions

The last two *Wilson* factors—the need for deterrence and adequacy of less drastic sanctions—also support entry of default judgment against Probo. First, the record demonstrates why less drastic sanctions would be insufficient—Probo's continued propensity for ignoring Court orders. Probo immediately disregarded the undersigned's 2022 *Order* and took no substantial steps to comply with the undersigned's January 18, 2023 deadline; in fact, Probo did not even direct substantial resources toward gathering the relevant documents for review until the Court's July 2023 *Order*. Instead, Probo

misled Plaintiff and the Court regarding its progress, all while continuing to seek to delay the progress of this action.

Indeed, Probo's violation of the Court's December 2022 *Order* and subsequent document "dump" combined with its other discovery tactics  unquestionably  is  an "abuse[ of] the  process  at  a  level  that  is  utterly inconsistent  with  the  orderly administration of  justice"  and  has  "undermine[d]  the integrity of the process."  *See Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x 118, 124 (4th Cir. 2019).[11]  Moreover, this Court has already effectively found that Probo acted in bad faith. (*See* ECF No. 153 at 2133-2134) (finding Probo made "inaccurate representations" to Philips regarding the status and extent of its 'rolling' production – *if not knowingly, then, at a minimum, in reckless disregard of the truth*") (emphasis added), and the prejudice to Philips is extreme and patently unfair as detailed above.

Probo  extolled  its  diligent  work  and  expenditure  of  resources  to  achieve  its compliance by the Court's August 18, 2023 deadline, and argued that default judgment as a sanction would be premature because Court did not warn of the default-judgment sanction until entry of its July 2023 *Order*, with which Probo indisputably complied. Probo's argument fails on factual and legal grounds. First, in light of the totality of the circumstances, Probo should not congratulate itself for its to-the-letter compliance with the undersigned's July 2023 *Order*. All parties are obligated to follow court orders, yet Probo only complied once a logical calculation of risk favored compliance. Likewise, the

---

[11] In *Beach Mart*, the Fourth Circuit affirmed the district court's  entry  of  preclusive  sanctions as well as its finding  that defendant's "misconduct had caused 'substantial' prejudice to Beach Mart and the court, requiring the court to 'reset' the case" and "that monetary sanctions would be insufficient to  deter  future discovery  violations  by  [defendant]  given  the  'willful nondisclosure' and 'gamesmanship' in which [defendant] had engaged." *Beach Mart*, 784 F. App'x at 124.

Fourth Circuit in the *Mey* decision precisely addressed why Probo's prematurity argument fails under the circumstances, stating as follows:

> While we have previously "emphasized the significance of warning a defendant about the possibility of default before entering such a harsh sanction," an explicit warning is not always necessary. *Hathcock v. Navistar Int'l Transp. Corp.*, 53 F.3d 36, 40 (4th Cir. 1995); *see also Lolatchy v. Arthur Murray, Inc.*, 816 F.2d 951, 956 (4th Cir. 1987) (Wilkinson, J., dissenting) (Because a party is already put on notice of the possibility of default by the terms of Federal Rule of Civil Procedure 37, "[t]o reverse the district court for failing to remind the defendant about the possibility of default would be worse than redundant; it would give the defendants yet another opportunity for delay"). There are circumstances, like the one we confront today, where the entry of default judgment against a defendant for systemic discovery violations is the natural next step in the litigation, even without an explicit prior warning from the district court.
>
> Indeed, we have affirmed grants of default judgment where a party engaged in "repeated misconduct never wholly remedied." *Richards*, 872 F.2d at 94. For example, in *Anderson v. Foundation for Advancement, Education & Employment of American Indians*, 155 F.3d 500 (4th Cir. 1998), we affirmed the district court's entry of default judgment against a defendant that repeatedly failed to comply with discovery orders requiring the party to produce requested documents. *Id.* at 503–05. And in *Hathcock v. Navistar International Transportation Corp.*, 53 F.3d 36 (4th Cir. 1995), although vacating the district court's judgment on other grounds, this court recognized that the imposition of "a default sanction can, under certain circumstances, be an appropriate response to the violation of a Rule 16 [scheduling] order." *Id.* at 40 ("After all, the express terms of Rule 37 permit a trial court to impose sanctions when a party fails to obey an order to provide or permit discovery.").

*Mey*, 71 F.4th at 203, 218 (4th Cir. 2023).

Likewise, the fourth and final *Wilson* factor—the need for deterrence—also strongly favors severe sanctions. There could not be a stronger case requiring default judgment to serve the purpose of deterring the type of egregious litigation tactics in

which Probo has engaged. As the Fourth Circuit has observed, "[t]he Supreme Court has instructed that this most severe sanction 'must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.' *National Hockey League*, 427 U.S. at 643." *Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs.*, 872 F.2d 88, 94 (4th Cir. 1989). *See also Zornes v. Specialty Indus.*, No. 97-2337, 1998 U.S. App. LEXIS 31686, at *28 (4th Cir. Dec. 21, 1998) ("For it is the court's duty to protect the interests not only of the parties directly prejudiced by discovery abuse, but also those litigants indirectly prejudiced when the court's resources are squandered due to an abusing party's misconduct."). *NHL v. Metro. Hockey Club,* 427 U.S. 639, 643 (1976) (affirming district court's dismissal with prejudice under Rule 37, in part, because ruling otherwise would motivate others "to flout other discovery orders").

Though harsh, the sanction of default judgment is warranted under the circumstances because "not only does the noncomplying party jeopardize his or her adversary's case by such indifference, but to ignore such bold challenges to the district court's power would encourage other litigants to flirt with similar misconduct." *Richards*, 872 F.2d at 92 (emphasis added). Indeed, "default judgment against the defendants now is . . . an unmistakable message to them and others that *the judicial system will not tolerate repeated misconduct never wholly remedied in the future.* To find otherwise would be to send the opposite message that *the court may be pushed, ignored and defied* to the outermost limits so long as the noncomplying party has even an inadequate fallback act ready in the wings should the final curtain be falling." *Id.* (emphasis added). So too here – anything short of default judgment will allow Probo (and other litigants) to take

31

a gamble and ignore a Court Order (critically governing the scope of the litigation) to the extreme prejudice of the opposing party (who cannot be wholly remedied, as here), knowing that at most, some lesser sanction may be implemented.

There is simply no excuse for Probo's egregious failure to comply with the Court's December 2022 *Order* in the first instance; its attempt to do so following the July 2023 *Order* has compounded the severe prejudice to Philips, and indeed, is a textbook example of an abuse of the judicial process. Because all of the *Wilson* factors support imposing the utmost sanctions, the undersigned respectfully **RECOMMENDS** that the Court enter an order for default judgment, finding Probo liable as to each of Plaintiff's six legal claims, and that this matter then proceed to trial solely on the issue of Plaintiff's damages.

Finally, the undersigned **FINDS** that the actions of Plaintiff's attorneys, Adam Arceneaux and Eric McKeown, with the Ice Miller firm, merit sanctions against these attorneys for violating Rule 11(b) of the Federal Rules of Civil Procedure. Once Probo's counsel finally got around to making a reasonable inquiry, it was clear to all that counsel had vastly overstated Probo's true progress toward completion of its document production, and made representations regarding progress despite counsel's knowledge that these representations lacked a reasonable basis in fact. Worse, Probo's counsel did not even *attempt* to comply with the Court's December 19, 2022 Order until July 21, 2023; Probo's counsel did not "fully compl[y] with the Order" until August 18, 2023, only after a month-long effort by an entire team of attorneys and personnel, with *daily oversight* by the undersigned. Furthermore, Plaintiff's introduction of the former Ultrasound Online employee's affidavit *and attached email communications* bear indicia of concealment,

much like the defendants in *Mey*.[12] Both attorneys were directly involved in implementation of Probo's discovery misconduct, and holding them financially responsible for the reasonable fees and costs incurred by Plaintiff in prosecuting its motions to compel and for sanctions, which the undersigned **FINDS** will adequately address their patent dereliction of duty as licensed attorneys and officers of the Court. (ECF Nos. 146; 225.)

## IV.    RECOMMENDATION

Severe sanctions are warranted under the circumstances. The shocking course of misconduct by Probo and its counsel in this civil action endangers the fair and timely administration of justice in civil litigation, and flouts the fundamental, "time-honored notion that the law and the courts of the United States are important parts of American Society worthy of respect." *Fenner v. Bell*, 1:08-cv-367, 2009 WL 6372547 n.1 (M.D.N.C. Nov. 13, 2009) (citing *Theriault v. Silber*, 579 F.2d 302, 303 (5th Cir. 1978)). Accordingly, for the reasons set forth hereinabove, pursuant to Rules 11(b)-(c) and 37(b)(2)(A) of the Federal Rules of Civil Procedure, the Court's inherent power, and the express prior warning in the Court's July 21, 2023 Order, the undersigned respectfully **RECOMMENDS** as follows:

(1) that Plaintiff's July 17, 2023 *Motion to Compel* (ECF No. 146) and subject renewed *Motion for Sanctions* (ECF No. 225) be **GRANTED**;

---

[12] The undersigned agrees with Probo, however, that the issue of spoliation as raised in Plaintiff's *Reply* brief (*see* ECF No. 253 at 7), is outside the scope of the motions pending before the Court. The undersigned finds that Probo's misconduct was sufficiently egregious regardless of the adequacy of its preservation of evidence, and thus makes no finding with respect to this issue.

(2) that the Court enter an order for default judgment, finding Probo liable as to each of Plaintiff's legal claims, and that this matter then proceed to trial solely on the issue of Plaintiff's damages;

(3) that Plaintiff be **AWARDED** reasonable fees and costs incurred in prosecuting its motions to compel and for sanctions, and **ORDERED** to submit an affidavit of fees and expenses, along with any supportive documentation or argument to justify the amount of fees and expenses requested, within fourteen (14) days of the Court's ruling on the instant *Proposed Findings and Recommendation*;

(4) that the Court impose monetary sanctions against attorneys Adam Arceneaux and Eric McKeown, personally, in an amount to be determined by Plaintiff's above-referenced affidavit; and

(5) that all pending motions regarding liability be **DENIED**, as moot.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge for the Southern District of West Virginia. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. A copy of any objections shall be provided to Judge Goodwin and to each opposing party or, if applicable, to its counsel.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy to all counsel of record and to any unrepresented party.

ENTER:      January 19, 2024

Dwane L. Tinsley
United States Magistrate Judge